12,945], in the Northern district of New York, the application was made too late, because not made within one year from the time of the adjudication. Mr. Justice Hunt says: "The authority to apply for a discharge rests entirely upon section 29. It must necessarily be taken with the limitations in that section contained. The only right to apply, there given, is to be exercised within one year from the time of the adjudication. In my judgment, this applies to all cases, whether there are debts proved, or assets received, or not. It is a case of limited authority, and there is no power to grant a discharge, unless it is applied for within the time prescribed. The excuse of the bankrupt for the delay is a reasonable one, and, if there was power, I should accept it as satisfactory." It has heretofore been the practice of this court to allow applications for discharge to be made after the expiration of one year from the adjudication of bankruptcy, in cases where the two circumstances concurred, that debts had been proved, and assets had come to the hands of the assignee, the construction given by this court to section 29 of the act [of 1867 (14 Stat. 531)],—section 5108 of the Revised Statutes,—being, that the application within one year from the adjudication was required only where no debts had been proved or no assets had come to the hands of the assignee; that, where either of those circumstances existed, the application might be made at any time after the expiration of sixty days from the adjudication, and within one year from the adjudication; and that, where debts had been proved and assets had come to the hands of the assignee, a discharge might be applied for at any time after the expiration of six months from the adjudication, and even after the expiration of one year from the adjudication. In the present case a debt was proved, and assets had come to the hands of the assignee. Therefore, under the former rulings of this court, the application was in time, although not made until more than 15 months after the adjudication. But the decision in Re Sloan [supra], is that of the circuit court, in review of the decision of the district court, and is controlling on this court. It is to the effect that the proper interpretation of the statute is, that all applications for discharge must be made within one year from the adjudication; that, where no debts have been proved, or no assets have come to the hands of the assignee, the application may be made after the expiration of sixty days from the adjudication; and that, where debts have been proved, and assets have come to the hands of the assignee, the application may be made after, but not until after, the expiration of six months from the adjudication. Under this construction, no discharge can be granted in this case. The question is one of the power and jurisdiction of the court, and not one depending upon the opposition of a creditor.

## Case No. 17,937.

### In re WOOD.

[5 N. B. R. 421.] [1]

District Court, W. D. Tennessee. 1871.

BANKRUPTCY—FRAUDULENT TRANSFER.

A transfer which is only the execution of a contract made when there was no circumstance to impeach it as an intended fraud on the bankrupt law, and when the parties were acting in good faith and long before anything occurred to throw a suspicion over the solvency of the debtor, will be protected, and a bill brought by the assignee in bankruptcy to recover personal property conveyed under the above state of facts will be dismissed.

[Cited in Smith v. Craft, 17 Fed. 706.]

In December, eighteen hundred and sixty-nine, within six, but more than four months prior to the filing of the petition in this case, James P. Wood, the bankrupt, proposed to one Willingham, to whom he owed a note for five thousand dollars, to convey to him certain land in payment of the debt, which proposition Willingham declined. Wood then told him that he could very easily sell the land and would do so to pay that debt if Willingham would take the purchase notes, to be secured by lien on the land in payment, to which Willingham agreed, but not in writing. Wood did afterwards sell the land and took notes for the purchase money for about the amount of the Willingham debt. Before they were delivered, Howell, Wood & Co., an extensive mercantile firm at Memphis, became bankrupt, and it was generally rumored that J. P. Wood was, by their failure, rendered insolvent by reason of his liabilities for that firm, but there was no proof that Willingham knew or had cause to know of these rumors about James P. Wood. He had before that come to Brownsville by appointment, to settle with Wood and take the purchase notes, but owing to sickness of one of the parties the settlement was not made. A few days after the failure of Howell, Wood & Co., James P. Wood and Willingham did settle by the surrender of Wood's note and the transfer to Willingham of the purchase notes for the land, and within four months afterwards James P. Wood became bankrupt. It was in proof that James P. Wood was regarded as solvent, and that at the time of the transfer of the notes it was not positively known in the community, when these transactions took place, to what extent he was involved in the failure of Howell, Wood & Co., but it was the general belief that he was very largely so involved. The assignee filed a bill in the district court to set aside the transfer of the notes to Willingham and to recover them for the estate.

Smith & Jefferson, for assignee.
Estes & Jackson, for Willingham.

[1] [Reprinted by permission.]

TRIGG, District Judge, held that the transfer was not fraudulent under the bankrupt act in the above state of facts. He held that the transfer was only the execution of a contract made when there was no circumstance to impeach it as an intended fraud on the act, and when it was .conceded the parties were acting in good faith, and long before the failure of Howell, Wood & Co. had thrown a suspicion over the solvency of James P. Wood; that it was not necessary that the contract then made should have been in writing, nor was it necessary that the notes should have been transferred to entitle Willingham to them, or to make the contract binding on Wood. In delivering the notes after he became insolvent he was only doing what he was bound by his previous agreement to do, and in the absence of all actual or intentional fraud in such delivery, it was the completion of a contract valid in itself and made in good faith before the insolvency, and the bill was dismissed, the assignee taking an appeal.

## Case No. 17,938.

### WOOD et al. v. ABBOTT et al.

[5 Blatchf. 325.] 1

Circuit Court, S. D. New York. July, 1866.

COPYRIGHT—PHOTOGRAPHIC PRINTING.

A picture on paper, made by the art of photography from a glass "negative," is not a print, cut or engraving, within the 1st section of the copyright act of February 3, 1831 (4 Stat. 436).

[Cited in Yuengling v. Schile, 12 Fed. 107.]

This was an action [by Hamilton Wood and others against Milton S. Abbott and others] in the nature of a qui tam suit, founded on the 1st, 4th, 5th, and 7th sections of the act of February 3, 1831 (4 Stat. 436), relating to copyrights. At the trial, a verdict was taken for the plaintiffs, for the sum fixed by the 7th section of the act, subject to the opinion of the court, and the plaintiffs now moved for judgment on the verdict.

George W. Wingate, for plaintiffs.

Thomas C. Fields, for defendants.

SHIPMAN, District Judge. The plaintiffs charge the defendants with pirating certain alleged "prints or engravings," the copyrights of which the plaintiffs allege belong to them. The case presented by the proofs is a novel one, at least in this court, and requires a statement of the facts in order to see the precise point which the judgment .of the court determines. The plaintiffs are photographers in the city of New York, and are engaged in business as partners, under the name of the New York Photographing Company. One Fish, an artist, drew in crayon two original drawings or designs of the human figure, one called "The Golden Age,"

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

and the other "School Days." These pictures he sold to the plaintiffs, and assigned to them, so far as he could legally do so, all the rights which he had to, or growing out of, the same. The object of this sale and assignment by Fish and purchase by the plaintiffs was to enable the latter to manufacture and copyright photographs of the original drawings. To carry out this object, the plaintiffs caused what are known in photography as "negatives" to be taken. From these negatives they produced great numbers of copies of the original .designs, but of a very much smaller size. Before the publication and sale of these copies, the plaintiffs deposited in the clerk's office of the United States district court for the Southern district of New York, printed titles of the designs, together with photographic copies thereof. They also, before the publication and sale of such copies, impressed on the latter the words, "Entered according to act of congress, &c." There is some dispute, in the evidence, as to whether or not these words were impressed on all of the pictures before they left the hands of the plaintiffs, but, for the purposes of this motion, I shall assume that they were placed on them all. These photographic copies were quite small, and were mounted on cards of nearly the same size, about two and a half inches by four. The pictures themselves were on a piece of thin paper, and these were pasted on the cards. The words "Entered according to act of congress, &c.," were not on the thin paper upon which the pictures were taken, but were impressed on the cards upon which they were pasted, just at the foot of the pictures. The defendants insist that, inasmuch as the statute requires these words to be "impressed on the face thereof," in order to entitle the party to the benefit of the act, the impression of the words on the card at the foot of the picture was not a compliance with this requirement, and that, therefore, the alleged copyright furnishes no protection to the publishers. It is not necessary to determine this point in the present case, for there is another one more prominent and strongly marked, which, in the judgment of the court, is decisive of the controversy between these parties.

The defendants, having purchased a copy of each of these small photographic pictures. made negatives from them, and, from such negatives, printed and sold in the market copies almost identical with those made and sold by the plaintiffs. The plaintiffs insist that, upon these facts, they have shown valid copyrights for these small photographs, made from the original designs in their possession, and that the defendants have infringed their rights in the premises, and the question is, whether the verdict taken at the trial can be supported by the 1st section of the act of 1831, upon which the alleged copyrights are founded. That section provides, that "any person or persons,